SIEBERT v. PATAPSCO SHIP CEILING & STEVEDORE CO. et al.

(District Court, D. Maryland. November 7, 1918.)

1. MASTER AND SERVANT ⬤⟶358—ELECTION OF REMEDY—WORKMEN'S COMPENSATION ACT.

A stevedore, injured while loading a vessel, who was entitled under Judicial Code, § 24, par. 3, as amended by Act Oct. 6, 1917, to the remedy afforded by the state Workmen's Compensation Act, *held* not to have elected that remedy by signing at the request of an attorney the notice to his employer contemplated by the Compensation Act, and to be entitled to sue in admiralty, etc.

2. SHIPPING ⬤⟶84(3)—INJURIES TO STEVEDORE—SAFE PLACE TO WORK—ORDERS.

A stevedore company, though it ordered its foreman to remove all hatch beams, etc., *held* charged with knowledge of noncompliance with order, so that it could not escape liability to a stevedore, injured by the falling of a beam on the ground the company had discharged its duty as to furnishing safe place, etc.

3. SHIPPING ⬤⟶84(1)—INJURIES TO STEVEDORE—VICE PRINCIPAL.

The foreman of a stevedore company *held* a vice principal as to a stevedore, so the company could not escape liability for the foreman's negligence on the ground he was a fellow servant of the injured stevedore.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. DAMAGES ⬤⟿132(9)—PERSONAL INJURIES—MEASURE.
     *Held,* that $3,791 should be allowed a stevedore for injuries which ne-
     cessitated the amputation of his leg below the knee, and caused a loss of
     wages and expenditure for medical attention amounting to $791.

In Admiralty. Libel by John Siebert against the Patapsco Ship Ceiling & Stevedore Company, the Prince Line, Limited, and Furness Withy & Co., Limited. Decree for libelant against the first-named respondent.

George T. Mister, of Baltimore, Md., for libelant.

John B. Deming and Whitelock, Deming & Kemp, all of Baltimore, Md., for respondents.

ROSE, District Judge. On January 5th last the respondent, the Patapsco Ship Ceiling & Stevedore Company, hereinafter called the "employer," was engaged through its employés, of whom the libelant was one, in loading the Chinese Prince, hereinafter referred to as the "ship." The respondents the Prince Line, Limited, and Furness Withy & Co., Limited, were respectively owner and agent of the ship.

The libelant was working in the ship's hold. By the fall of one of the strong backs intended to support the hatch covers, one of his legs was so badly crushed as to necessitate amputation below the knee. He suffered other serious and painful injuries, but these, fortunately, proved to be temporary.

[1] One week after the accident libelant signed the notice to the employer, contemplated by the Workmen's Compensation Act of Maryland, that he had been hurt, and requesting that it should, in accordance with law, supply him with medical attendance. This notice was countersigned by a well-known member of the Baltimore bar, and by or through the latter was promptly served upon the employer. Thereafter the same attorney filed a claim with the state Industrial Accident Commission. Because libelant was long in the hospital, the hearing was put off, and before it was actually held he asked permission of the commission to withdraw his claim. After inquiry, the commission permitted him to do so, on the ground that in the condition he was at the time he signed the notice he did not so appreciate its nature as to make it fair to hold that he had irrevocably committed himself by it. The employer in this court insists that, in spite of the findings and action of the commission, the delivery of the notice was a final election to waive libelant's right to proceed in the admiralty.

The libelant here testified that he signed such notice because it was brought to him by a young man who told him he should sign it. It was then only a week after the accident, and he was in such a state of pain from some of his injuries that he could not, and did not, give the matter any consideration, but appended his signature, as he had been bidden to do. He said he thought the young man referred to was an assistant to the member of the bar who had countersigned the paper, but how either of them had learned of the accident, or who, if any one, had asked either of them to interest himself in the mat-

ter, he did not know. I sent at once for the attorney in question, and he testified that he had never seen the libelant until the latter was out of the hospital, and had come to tell him that he wanted to put his case in other hands. He further stated that the matter had originally been brought to him by a young lawyer, whose name he gave, and for whom he had occasionally tried cases; but the gentleman had at least temporarily quit practice to accept employment in a munition plant. There the evidence on this branch of the case stopped, except that it appeared that the employer, in consequence of the notice referred to, but without the knowledge of the libelant, had shortly after the accident paid $29 of the latter's hospital expenses. Before he was discharged from the hospital, his total bill had run up to $266.

The evidence shows, as the commission held, that the libelant did not appreciate, and was not in a condition to appreciate, the significance of the paper he had signed, nor did he know that the person who procured his signature was claiming to act as his representative. Every rational system of jurisprudence strives to insure, as far as may be, that a man shall not lose important rights merely because he has done some formal thing in excusable ignorance of its nature and significance.

When it came out for the first time at the hearing in this court that the $29 had been paid, I required the libelant to reimburse the employer as a condition to going on with his case. This was done at once. I did not intend to rule that such a requirement should always be made, as sometimes it might work hardship and injustice; but it is obviously fair wherever the libelant is in a condition to comply with it, as in this case he was. In this state of the record, it is unnecessary to decide anything, except that this libelant was free to prosecute his libel. Whether he could have done so, had he understandingly invoked the jurisdiction of the commission, need not be passed upon.

The act of Congress approved October 6, 1917 (40 Stat. 395, c. 97) gave an employé, injured on water, the right to avail himself of the Workmen's Compensation Law of the state. This result was accomplished by amending paragraph 3 of section 24 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1091 [Comp. St. 1916, § 991]). The relevant portions of that paragraph were a part of the original Judiciary Act of 1789, and gave the District Courts of the United States cognizance of "all civil cases of admiralty and maritime jurisdiction, saving to all suitors the right of a common-law remedy, where the common law is competent to give it." The amending statute added the words, "and to claimants the rights and remedies of the Workmen's Compensation Law of any state." So far as I know, it has never been held that the mere institution of a common-law suit to recover for a maritime tort precluded the plaintiff from subsequently seeking relief in admiralty.

[2, 3] It remains to pass upon the merits. The accident happened because the libelant was working under a hatch beam or strong back, which had not been removed, and which was not bolted in place. The hook or the chain, used to raise and lower the load, caught under the beam and pulled it out of its support. There is no question that the

place in which the plaintiff was working was, under such circumstances, unsafe.

It is in evidence that the employer had given general instructions to its foremen always to remove all the hatch beams, or, if any were left in place, to see that they were firmly secured by bolts or pins. It is argued that the foreman was a fellow servant of the libelant, and that the latter assumed the risk of his negligence. It is true that the instruction was given, and that the chief executive of the employer appreciated its importance, and was sincerely anxious that it should be obeyed. It is equally clear, however, that his subordinates habitually disregarded it, in that they never made any real attempt to see that it was enforced.

To remove the hatch beam took from 5 to 15 minutes. The bolts for it were not always right at hand. The foreman and the gang leaders were anxious to maintain their tonnage record. Familiarity with danger made them careless of the safety of the men under them. So generally was the instruction ignored, and so easy would it have been for the employer to have discovered that fact, that it cannot now successfully claim that by merely issuing the order it had done all that was incumbent on it to make sure that the men were given a safe place in which to work. That obligation it could not delegate. Moreover, the foreman or "chargeman," who should have seen that the beam was removed or bolted in, was, upon the evidence, a vice principal, rather than a fellow servant, of the libelant. He had full charge of the loading of the ship and of all the men employed in doing it. Subject to his orders were the gang leaders, who had the right to employ and discharge the workmen—in the modern vernacular, the power of "hiring and firing." The men who did the actual work were bound to obey the orders of the foreman. I am satisfied, although he denies it, that he gave the order not to remove some of the beams, including the one which fell on the libelant, and that the libelant and his fellow workmen, if they were to maintain their places, had no choice other than to do what he told them to do. The employer must be held liable.

There is nothing shown to charge either of the other respondents, and as to them the libel must be dismissed.

[4] The costs of medical attendance, of the artificial limb, and the loss of wages of libelant while in the hospital, total $791. I will allow $3,000 more as compensation for his suffering and permanent injuries, or an aggregate of $3,791.

A decree against the employer for that amount will be signed.